## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCISCO JAVIER MONTES RAMIREZ, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | NO.  11-6411 |
| | : | |
| PATRICIA BUYAUSKAS, | : | |
| Defendant. | : | |

DuBOIS, J.                                                    February 24, 2012

## M E M O R A N D U M

**Table of Contents**

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        A.  The Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        B.  The Family's Life in Mexico. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        C.  Departure from Mexico and Events of July and August 2010. . . . . . . . . . . . . . . 8
        D.  Petitioner's Efforts to Regain Custody. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        E.  Life of Respondent and Children in the United States. . . . . . . . . . . . . . . . . . . . 12
        F.  Communications Among Petitioner, Respondent, and Children After Departure. 14
        G.  Views of Paquito and Katie. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV.   CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        A.  The Case Is Within the Scope of the Hague Convention, and Abstention Is Not
              Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
              1.  The Hague Convention Applies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
              2.  The Case Poses No Abstention Problems. . . . . . . . . . . . . . . . . . . . . . . . 19
        B.  Petitioner Has Established a Prima Facie Case for Return of Children. . . . . . . . 19
              1.  First Prong of Prima Facie Case: The Retention Took Place No Later
                    Than July 25, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
              2.  Second Prong of Prima Facie Case: The Children's Habitual Residence
                    Immediately Prior to Wrongful Retention Was Mexico. . . . . . . . . . 22
              3.  Third Prong of Prima Facie Case: The Wrongful Retention Breached
                    Petitioner's Custody Rights Under Mexican Law. . . . . . . . . . . . . . . 23
                    i.  Legal Standard Under the Hague Convention. . . . . . . . . . . . . . . 23

        ii.  Custody Law in the State of Jalisco, Mexico. . . . . . . . . . . . . . . . . **24**

        iii.  Application of Jalisco, Mexico, Custody Law. . . . . . . . . . . . . . . **25**

    **4.  Fourth Prong of Prima Facie Case: Petitioner Was Exercising Custody**
        **Rights at the Time of Retention. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26**

    **5.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28**

  **C.  Respondent Has Established Affirmative Defenses to Return of Children. . . . . 28**

    **1.  The Article 12 Well-Settled Affirmative Defense Is Established. . . . . . . . 29**

        **i.  The Well-Settled Affirmative Defense Is Available to Respondent**
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

        **ii.  The Well-Settled Affirmative Defense Applies. . . . . . . . . . . . . . . . 32**

    **2.  The Article 13 Mature-Child-Objecting Affirmative Defense is Established**
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

  **D.  A Discretionary Order of Return of Children Is Not Appropriate. . . . . . . . . . 38**

  **E.  Petitioner Is Not Entitled to Fees and Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . 38**

**V.**       **CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39**

## I.  INTRODUCTION

This case arises under the Convention on the Civil Aspects of International Child Abduction (referred to as "the Hague Convention" or "the Convention").  Petitioner Francisco Javier Montes Ramirez, a Mexican citizen, alleges that his children's mother, respondent Patricia Buyauskas, wrongfully moved their three minor children, Paquito, Katie, and Chelsey, to the United States in July 2010 without his permission.  Presently before the Court is the Petition for Return of Children to Petitioner ("the Petition"), in which petitioner seeks the return of his three children to Mexico.  After considering the testimony of the witnesses, the exhibits received in evidence, and the arguments of counsel, the Court makes the Findings of Fact and Conclusions of Law set forth below and denies the Petition.

## II.  PROCEDURAL HISTORY

Petitioner filed the Petition on October 13, 2011, and filed a Petition for Immediate Issuance of Show Cause Order to Respondent on November 29, 2011.  On November 30, 2011, the Court granted petitioner provisional relief pending a hearing pursuant to 42 U.S.C. § 11604(a), which authorizes "measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of [a Hague Convention] petition."  The provisional relief included, inter alia, scheduling a hearing at which respondent was required to appear and to show cause as to why the three children should not be returned to Mexico.  (Nov. 30, 2011, Order Granting Petition for Immediate Issuance of Show Cause Order to Respondent.)

The Court held an evidentiary hearing on December 22, 2011, and January 18, 2012.[1] Petitioner attended the first day of the hearing and testified in person with the assistance of a Spanish-language interpreter. He participated in the second day of the hearing by telephone from Mexico with the assistance of Spanish-language interpreters who were present in the courtroom. On each hearing date, the Court also conducted in camera interviews of the two oldest children in the presence of both parties' counsel but without the parties present.

## III. FINDINGS OF FACT[2]

The Court makes the following Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a).

### A. The Parties

1. Petitioner is a Mexican national who presently resides in the city of Zapopan, which is located near Guadalajara in the Mexican state of Jalisco. (Application for Assistance Regarding Francisco Javier Montes Jr. ("Hague Application"), Pet'r's Ex. 4, at 1; Tr. Dec. 22, 2011 Hrg. ("12/22/11 Tr.") 11.) He has always lived in Mexico. (12/22/11 Tr. 11.)

---

[1] The Court conducted the evidentiary hearing pursuant to the Federal Rules of Evidence. See Avendano v. Smith, No. 11-0556, 2011 WL 3503330, at *1-2 (D.N.M. Aug. 1, 2011) (holding that the Federal Rules of Evidence apply to Hague Convention proceedings); cf. Fed. R. Evid. 1101(b) ("These rules apply in . . . civil cases and proceedings . . . ."); Karkkainen v. Kovalchuk, 445 F.3d 280, 290 (3d Cir. 2006) (approving district court's hearsay rulings under Federal Rules of Evidence). The only special evidentiary rule in Hague Convention cases is self-authentication of any document "included with . . . [the] petition" or "relate[d] to the . . . petition." 42 U.S.C. § 11605.

[2] The Court observes preliminarily that the relationship between the parties was acrimonious throughout the case. This acrimony was, at times, reflected in highly conflicting testimony. The Court makes its Findings of Fact "[h]aving carefully weighed the conflicting testimony, and taking into account the demeanor and reasonableness of the witnesses' explanations." Journe v. Journe, 911 F. Supp. 43, 45 (D.P.R. 1995) (Hague Convention case).

2.  Around 1992, while visiting his sister in Philadelphia, petitioner met respondent at a party.  (Id. at 11–12.)  Respondent, a United States citizen, moved to Mexico to live with petitioner approximately three months after they met.  (Id. at 12.)

3.  Petitioner and respondent married in West Chester, Pennsylvania, on August 23, 1997. (Id.; Marriage Certificate, Exhibit to Hague Application Regarding Kate Alexis Montes, Pet'r's Ex. 4, at 1.)

4.  Petitioner and respondent have three children together: Francisco Javier, Junior, born January 7, 2000, age twelve ("Paco" or "Paquito") (referred to as "Paquito")[3]; Kate Alexis, born August 14, 2003, age eight ("Katie"); and Chelsey Megan, born March 3, 2009, age two. (Hague Application Regarding Francisco Javier Montes Jr. 1; Hague Application Regarding Kate Alexis Montes 1; Hague Application Regarding Chelsey Megan Montes, Pet'r's Ex. 4, at 1.)

5.  All three children were born in the United States and are United States citizens, but, with the exception of some visits to relatives in the greater Philadelphia area, they never resided in the United States before August 2010.  (12/22/11 Tr. 12, 15–16.)

**B.  The Family's Life in Mexico**

6.  Petitioner works as a "systems engineer," repairing computers.  He also holds a taxi cab permit from the Mexican government and earns some income by leasing the permit, although he also drives a cab on a "part-time" basis when the lessees do not wish to drive.  (Id. at 30.)  Petitioner earns the equivalent of 450–500 United States dollars per month.  (Id. at 30, 44.)

---

[3] "Paco" is a nickname for Francisco, and "Paquito" is the affectionate, diminutive form of Paco. Both petitioner and his twelve-year-old son are named Francisco and are known by the nickname Paco.  This Memorandum refers to petitioner as "petitioner" and to twelve-year-old Francisco Javier Montes Ramirez, Junior, as "Paquito."

7.  Petitioner's home in Mexico, where he lived with respondent and their children, is a three-bedroom apartment owned by petitioner's sister, Lourdes Rankin.  (Id. at 45–46, 99.) Petitioner pays his sister rent by doing work for her, including "painting and maintenance."  (Id.)

8.  In Mexico, Paquito was most recently enrolled in fifth grade, and Katie was in second grade; Chelsey was too young for school.  (Id. at 13.)  The children attended a large public school at which the school day lasted four hours.  (Id. at 61; Tr. Jan. 18, 2012 Hrg. ("1/18/12 Tr.") 30.)

9.  The children had friends in Mexico and participated in activities like "karate and soccer," and the family was active in the local Catholic church.  (12/22/11 Tr. 13.)

10.  The children received inadequate medical care in Mexico because the family lacked medical insurance.  (1/18/12 Tr. 38, 45–46.)  In Mexico, the children did not have regular doctors or dentists, and they only were able to see a doctor when they were sick.  (Id.)  After Paquito arrived in the United States, respondent learned that Paquito had contracted a latent form of tuberculosis in Mexico that required nine months of antibiotic treatment.  (Id. at 58–59.)

11.  Petitioner was responsible for at least some childcare, including taking the children to school and activities, spending time with them after school and on the weekends, and eating meals with them.  (12/22/11 Tr. 14.)  Petitioner's testimony that he was solely responsible for taking care of the children in Mexico while respondent "would paint her fingernails at home" lacks credibility and is rejected.  (Id. at 63.)

12. As to the relationship between petitioner and respondent in Mexico, the Court finds that both parties' testimony was at times hyperbolic and does not credit the testimony of either petitioner or respondent in full.

13. According to petitioner's sister, in public, petitioner and respondent looked like a "normal couple . . . they [had] no problems, they look[ed] great." (Id. at 103.)

14. The Court does not credit petitioner's testimony that he and his wife had a perfect marriage in which they never disagreed or fought. (Id. at 41–42, 52.) Notwithstanding their public façade, petitioner and respondent experienced marital difficulties and sometimes had heated disagreements about whether the family should eventually relocate to the United States and other matters. (1/18/12 Tr. 15, 55–56.) Respondent wished to move to the United States with the children, but petitioner did not. (12/22/11 Tr. 20; 1/18/12 Tr. 43 ("[Respondent]: Discussions about me moving to the United States have always been, have always been present. It was never from the very beginning when I went to Mexico from the first time I met him[,] it was never my intention to stay in Mexico.").)

15. The parties presented starkly conflicting testimony as to incidents of domestic violence and allegedly disproportionate physical discipline of Paquito. Respondent testified that petitioner hit her and the children but that she never hit the children. (1/18/12 Tr. 31–32, 56.) Paquito testified that "[m]ore than once," his father "would hit [him] with a belt." (Id. at 83.) Petitioner testified that he never hit respondent or the children but that respondent sometimes hit the children. (12/22/11 Tr 64–65.) Because the Court's Conclusions of Law are not contingent on express findings as to intrafamily violence, the Court need not resolve the factual disputes and declines to make detailed findings of fact as to the extent or nature of such violence or whether corporal discipline the parents imposed on the children was appropriate.

16. Respondent was unhappy with the marriage and with the manner in which petitioner treated the children, and her desire to move to the United States increased in June and July 2010. (See 1/18/12 Tr. 15 ("I was tired of the abuse, I was tired of him treating me the way he was

-7-

treating me and the kids and I told him that I no longer wanted to live in Mexico.").)  She tried to leave the marriage on two occasions before the incident that gave rise to this action.  (Id. at 55–56.)

17.  Respondent never filed for divorce or for custody of the children in Mexico.  (Id. at 50–51.)

### C.  Departure from Mexico and Events of July and August 2010

18.  As of June 2010, respondent had recently reconnected with her biological father, Richard Buyauskas, who lived in Houston, Texas, after an extensive period during which they did not communicate.  (Id. at 44.)

19.  On about June 11, 2010, Richard Buyauskas purchased airline tickets for respondent, Paquito, Katie, and Chelsey.  (Id. at 14; Continental Airlines Ticket Record, Pet'r's Ex. 1, at 1.) The airline tickets were for round-trip travel between Guadalajara, Mexico, and Houston, Texas. (Continental Airlines Ticket Record 1.)  Respondent and the children were to leave Mexico on July 12, 2010, and to return to Mexico on Continental Airlines Flight Number 2910 on September 3, 2010.  (Id.)

20.  Petitioner believed that respondent was planning to travel to the United States with the children in July 2010 "[t]o visit her father, her new father, to travel here to Philadelphia to visit her mother, and to return to Mexico" on September 3, 2010.  (12/22/11 Tr. 16; 1/18/12 Tr. 91–92.)

21.  Petitioner had "a concern" about the trip because he was worried that respondent and the children might not return.  (12/22/11 Tr. 19–20.)  Respondent had told him that she wanted the family to move to the United States, but petitioner was hesitant to agree because respondent was just reconnecting with her biological father.  (See id. (petitioner's testimony that he told

respondent: "[I]t wasn't the right [time], that we could see about it later when she had met her father, and that she should meet him first and then we would think about moving later.").)

22.   Petitioner, respondent, and the children had a family meeting in June or July 2010 in which the entire family voted on whether respondent and the children would travel to the United States to visit respondent's biological father.  (1/18/12 Tr. 15–18, 78–80, 85.)  Respondent introduced evidence that this vote determined whether respondent and the children would relocate to the United States permanently.  She and Paquito testified that Paquito cast a deciding vote in favor of moving and that, in response, petitioner said, "I give you your freedom."  (Id.) Respondent and Paquito also testified to events that occurred after the vote but before their departure that arguably support the contention that petitioner agreed to the family's separation. (Id. at 18–20, 79–80.)  For several reasons, however, the Court credits petitioner's testimony that "[t]he vote did exist but . . . only referred to holiday time, vacation."  (Id. at 89.) First, petitioner's subsequent actions, including contacting the Mexican authorities in late July 2010 immediately after respondent informed him that she was not returning, are not consistent with a prior renunciation of parental rights.  Second, understanding the vote as the children's expression of interest in visiting Texas is consistent with petitioner's fear that respondent might choose to remain in Texas with the children due to respondent's increasing unhappiness in the marriage. Third, respondent's testimony about the vote at times corresponded with petitioner's testimony that he did not understand the vote to constitute an irrevocable decision that respondent and the children would leave Mexico permanently; she testified that, notwithstanding the vote, petitioner said to her at the airport: "If you still love me I will expect your return on September 3rd."  (Id. at 20.)

23.  Petitioner did not consent to respondent and the children moving to the United States permanently in July 2010.  (12/22/11 Tr. 16; 1/18/12 Tr. 92.)

24.  Petitioner executed a document that gave respondent permission to travel outside of Mexico with the children.  (12/22/11 Tr. 20.)[4]  Respondent did not seek permission from a court to remove the children from Mexico before leaving.  (1/18/12 Tr. 50–51.)

25.  On July 12, 2010, petitioner drove respondent and the children, who had only some of their belongings with them, to the airport.  (Id. at 20.)  Among those belongings were legal documents, including the children's birth certificates and the parties' marriage certificate.  (12/22/11 Tr. 20, 28.)

26.  On July 12, 2010, respondent and the children traveled from Mexico to Houston, Texas, where they stayed with Richard Buyauskas for about a month.  (1/18/12 Tr. 15.)

27.  Respondent called petitioner from Richard Buyauskas's house about a week after leaving Mexico and informed him that she intended to remain in the United States with the children permanently.  Respondent told petitioner that he could not "follow them or do anything because she's in the United States and that she has the support of her whole family."  (12/22/11 Tr. 21.)

28.  Petitioner tried to encourage respondent to return to Mexico with the children.  (Id.)  After receiving respondent's phone call, petitioner began seeking legal assistance to regain custody.  Those efforts are discussed in section II.D infra.

29.  At some time in July or August 2010, respondent and the children took a road trip to Florida with Richard Buyauskas to visit the area where Mr. Buyauskas used to live.  (1/18/12 Tr.

---

[4] Prior to the hearing, respondent had alleged that Paquito destroyed this document at petitioner's request in late July 2010.  (Francisco Javier, Junior, Note, Pretrial Mem. Submitted by Patricia Buyauskas Ex. B, at 1.)  Neither the form nor testimony about its destruction was introduced in evidence.

21.)  Respondent and the children returned to Texas and then traveled to West Chester,

Pennsylvania, where respondent's mother, Rosie Oyola, resides with respondent's stepfather.

(Id. at 21–22.)

### D.  Petitioner's Efforts to Regain Custody

30.  In late July 2010, after the telephone conversation in which respondent said she and

the children were not returning to Mexico, petitioner contacted the Mexican Secretariat of

Foreign Affairs ("the Secretariat") for assistance in regaining custody of his children.  (12/22/11

Tr. 27-28; see also 1/18/12 Tr. 91–92 (petitioner's testimony that "[w]hen she told me she had

no intention of returning immediately I placed a complaint with the police . . . and I started to

appeal to the Hague").  The Secretariat informed petitioner that they could not act at that time

because respondent and the children had plane tickets to return to Mexico on September 3, 2010,

but that he could begin gathering the documents he would need to file an application under the

Hague Convention.[5]  (12/22/11 Tr. 27–28.)

31.  Because respondent took several of the necessary documents when she went to the

United States,[6] petitioner had to obtain copies from authorities in the United States.  (Id. at 28.)

Petitioner gathered all of the documents and, once he collected them, filed three Hague

---

[5] Countries that are parties to the Hague Convention are required to designate a "Central
Authority" to offer aggrieved parents "assistance in securing the return of [a] child."  Art. 8.
Parents seeking assistance must file an application with the Central Authority containing
information about the children.  Id.

[6] In his testimony, petitioner implied that respondent took the documents to frustrate his ability
to recover custody, (12/22/11 Tr. 28), but no such evidence was introduced at the evidentiary
hearing.  Because there are other explanations for why respondent may have taken the
documents, including to ease passage through immigration while traveling across the United
States–Mexico border, the Court declines to draw such an inference.  See United States Customs
and Border Protection, "Children - Child traveling with one parent or someone who is not a
parent or legal guardian or a group," CBP Info,
https://help.cbp.gov/app/answers/detail/a_id/268/~/children---child-traveling-with-one-parent-
or-someone-who-is-not-a-parent-or (last visited Feb. 2, 2012).

Applications—one for each child—with the Secretariat on November 23, 2010.  (Applications for Assistance, Pet'r's Ex. 4; 12/22/11 Tr. 28.)

32.  The United States Department of State Office of Children's Issues ("the CI") received a copy of the Hague Applications on December 22, 2010.  (12/14/11 Letter from Beth Cooper to Pet'r, Pet'r's Ex. 6, at 1.)  The CI "confirmed [respondent's] and children's whereabouts in Pennsylvania" on December 27, 2010, and requested from the Secretariat "proof of the applicant's custodial rights . . . in order to complete the application" on January 26, 2011. (Id.)

33.  Petitioner did not come to the United States to visit the children because the Secretariat told him he "was doing the right thing [pursuing the Petition] and . . . should wait." (12/22/11 Tr. 37.)

34.  The CI received the "civil code of Jalisco from the Mexican Central Authority, which completed the application for the children's return," on June 16, 2011, and began processing petitioner's request for legal assistance on June 29, 2011.  (Id.)

**E.  Life of Respondent and Children in the United States**

35.  From August 2010 until December 2011, respondent and the children lived in respondent's mother's home in West Chester, Pennsylvania, with respondent's mother and stepfather.  (Id. at 5–6.)

36.  On December 2, 2011, respondent and the children moved to a four-bedroom, one-and-a-half-bathroom townhome in West Chester, Pennsylvania, in which each child has his or her own bedroom.  (Id.)  The housing is government-subsidized; respondent pays $118 per month in rent.  (Id. at 52.)  The townhome is close to respondent's mother's home.  (Id. at 6.)

-12-

37.  Paquito and Katie speak English fluently and eloquently.  They did not speak English when they arrived.  (Id. at 80–81.)

38.  Paquito and Katie are happy in the United States and have many friends.  (Id. at 22.) They have adjusted well to life in the United States and have close relationships with respondent's family, including her mother and her brother, Jose Oyola.  (See id. at 64 (testimony of Rosie Oyola that children's adjustment to life in the United States was "impressive"); id. at 69–70 (testimony of Jose Oyola that he sees the children three times a week and that they are doing "extremely well").)

39.  Paquito, a sixth-grader, and Katie, a third-grader, attend school in the United States, where both do very well and are on the honor roll.  (Id. at 22.)  Chelsey, age two-and-a-half, is too young for school.

40.  Paquito is in the gifted program at his school.  (Id. at 22, 80.)  Katie "love[s] school" and gets "tens, eights, and nines and sometimes sevens" on her work.  (Tr. Jan. 18, 2012, Chambers Conf. ("1/18/12 Chambers Tr.") 7.)

41.  Paquito plays Little League baseball.  (1/18/12 Tr. 22.)

42.  The children receive very good medical care in the United States that is superior to the care they received in Mexico.  (Id. at 58–59; 1/18/12 Chambers Tr. 6-7.)[7]

_____

[7] In addition to respondent's testimony on this issue, the Court credits Katie's in camera testimony, which was as follows:

> THE COURT: [H]ave you ever been to a dentist?
> KATIE MONTES: Never in Mexico, never.
> THE COURT: What about here?
> KATIE MONTES: I went here three times to the dentist and in Mexico I only got one shot in my arm.  Over here . . . I got five shots, one time I got ten and my father never took me to a dentist . . . .
> THE COURT: Do you have a regular doctor here now?
> KATIE MONTES: Yes.

43.   The children's standard of living is higher in the United States than it was in Mexico. (See 1/18/12 Chambers Tr. 6 ("KATIE MONTES: [W]e have more stuff and we never had . . . too much stuff in Mexico . . . I mean like . . . food and more things so we can live[,] and more toys and clothes.").)

44.   Respondent is presently unemployed but recently obtained a "nail technician license."  (1/18/12 Tr. 52.)  Each month, respondent receives $558 in welfare payments and $600 in food stamps; her family also provides some financial assistance.  (Id. at 52, 60.)  She intends to begin working once this case is resolved.  (Id. at 52.)

45.   Respondent is the primary caretaker for her children.  (See, e.g., id. at 69 (respondent's brother's testimony that respondent "works extremely hard to take care of the children").)  Respondent's family sometimes helps her care for the children, including watching them when they get home after school.  (Id. at 64, 69–70.)  The children attend church with respondent's mother.  (Id. at 64.)

46.   Respondent filed a petition for divorce and for primary physical and legal custody of all three children in the Court of Common Pleas for Chester County in West Chester, Pennsylvania, on December 8, 2011.  (Compl. Divorce, Resp't's Ex. 3.)

**F.  Communications Among Petitioner, Respondent, and Children After Departure**

47.   The Court finds that petitioner maintained sporadic contact via telephone and Skype[8] with respondent and the children after they arrived in West Chester.  The communication ceased after petitioner and respondent's mother had an argument on the telephone in February 2011.[9]

---

(1/18/12 Chambers Tr. 6–7.)

[8] Skype is a computer program that allows users to communicate over the Internet by instant message, video chat, and voice chat.  Internet Calls—Skype Features, Skype, http://www.skype.com/intl/en-us/features/ (last visited Feb. 23, 2012).

[9] The parties' evidence on this point was only partially consistent.  Petitioner testified that the communication ended in November 2010, when respondent's mother became upset about

(1/18/12 Tr. 6–13, 65–67, 70–71.)   Petitioner was no longer able to call respondent's mother's home telephone line because she changed her number, and the parties no longer set up Skype conversations.  (Id.)

48.   Petitioner sent respondent money twice after respondent came to the United States with the children: $200 on October 18, 2010, and $285 on November 12, 2010.  (12/22/11 Tr. 56–57.)

49.   On February 21, 2011, respondent wrote to petitioner via e-mail: "[T]he federal offices want to know if you plan on supporting your children, since you haven't up to now . . . [it is] necessary to know so I can have an answer and that way I can also get the kids a cell phone so that you can talk to them without having to use my mother's phone line."  (2/21/11 E-mail 1.) This e-mail upset petitioner because he believed it was inappropriate for respondent to condition his ability to speak with the children on his sending respondent money.  (See 12/22/11 Tr. 68–69 (inter alia, petitioner's testimony that "[s]omeone who takes children out of their home and then demands money is a kidnapper").)

50.   Petitioner had no contact with respondent or the children from February 21, 2011, to November 2, 2011.  (1/18/12 Tr. 33–34.)  He stopped contacting the children for multiple reasons, including the advice of the Mexican authorities (discussed infra) to let the legal process

---

something Paquito said to petitioner over Skype and "they shut off the communication" and "changed their telephone number."  (12/22/11 Tr. 26-27, 53–55, 57–59, 74.)  Respondent, Paquito, respondent's mother, and respondent's brother testified that the telephone calls and Skype conversations stopped after petitioner argued with petitioner's mother over the telephone in February 2011.  (1/18/11 Tr. 6–13, 65–67, 70–71.)  The Court credits respondent's version of the events for several reasons: multiple witnesses provided corroboration; petitioner did not subject any of respondent's witnesses to cross-examination on this issue, nor did he contradict the testimony on rebuttal; and respondent introduced into evidence an e-mail she sent petitioner on February 21, 2011, that supports the contention that the argument occurred.  (See February 21, 2011, E-mail from Patricia Buyauskas to Paco Montes ("2/21/11 E-mail"), Resp't's Ex. 1, at 1–2 (original in Spanish accompanied by English translation) (stating "[t]he manner in which you answered my mother was not right"); see also 1/18/12 Tr. 11–13.)

run its course and mental health issues he suffered as a result of the children moving to the United States.  (12/22/11 Tr. 69–70.)

51.  On November 2, 2011, after being served with the Petition, respondent sent petitioner a letter by mail and e-mail that discussed, inter alia, respondent's view that the parties could "come to an amicable agreement" and should "install Skype again as a means of communication."  (November 2, 2011, Letter from Patricia Buyauskas to Francisco J. Montes, Resp't's Ex. 2, at 1–3) (original in Spanish accompanied by English translation).

52.  After November 2, 2011, petitioner resumed sporadic contact with the children by Skype.  (1/18/12 Tr. 40.)  Petitioner also obtained respondent's cell phone number and was able to call her to set up Skype sessions with the children, although the cell phone has not always been reliable and sometimes gave petitioner an "out of service" message when he tried to call. (Id.; 12/22/11 Tr. 79–80.)

53.  On December 23, 2011,[10] petitioner saw the children in person for the first time since they left Mexico.  (1/18/12 Tr. 22–29, 72–73, 97.)  This visit occurred at respondent's home pursuant to the Court's ruling at the conclusion of the December 22, 2011, hearing that petitioner should be allowed to visit with the children at respondent's home at a time to be agreed upon by the parties, through counsel.  (12/22/11 Tr. 125.)[11]  Respondent's brother was also present. (1/18/12 Tr. 72–73.)

54.  Since December 23, 2011, petitioner has spoken to the children by Skype at least once.  (Id. at 29.)

---

[10] Petitioner testified on rebuttal that the visit took place on December 24, 2011, but he was unsure of the date; the Court credits respondent's testimony that it occurred the day after the December 22, 2011, hearing.  (1/18/12 Tr. 22.)

[11] During the visit, petitioner and respondent had an argument that petitioner's niece ultimately defused.  (1/18/12 Tr. 25–26.)

### G. Views of Paquito and Katie

55.  Paquito wishes to remain in the United States.  (See 1/18/12 Chambers Tr. 2–3 ("[PAQUITO]: I want to stay here.  THE COURT: Do you have any doubts about that? . . . [PAQUITO]: No, I'm sure I want to stay here.").)  Paquito's view was his own and was not improperly influenced by respondent or respondent's family.

56.  Katie wishes to remain in the United States.  (See id. 5–6 ("THE COURT: Where do you want to stay?  KATIE MONTES: I want to stay here.").)  Katie's view was her own and was not improperly influenced by respondent or respondent's family.

## IV.  CONCLUSIONS OF LAW

The Hague Convention establishes a framework to address allegations that a child has been wrongfully removed from one country to another or that a child has been wrongfully retained outside the child's country of habitual residence.  It was adopted in the United States as the International Child Abduction Convention Between the United States of America and Other Governments Done at the Hague October 25, 1980, July 1, 1988, T.I.A.S. No. 11670.  The Convention's implementing legislation in the United States is the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq.  Under ICARA, this Court has jurisdiction over the Petition, 42 U.S.C. § 11603(a), and must decide the case in accordance with the Convention's provisions as implemented by ICARA, 42 U.S.C. § 11603(d).

Analysis of a petition for return of a child under the Convention involves several steps.  First, the Court must determine whether the case is within the scope of the Convention and whether it should abstain from deciding it due to other pending proceedings.  Second, petitioner has the burden of making a prima facie case for return by a preponderance of the evidence.  Third, if petitioner makes out a prima facie case, respondent has the burden of proving that

return is not appropriate because one or more affirmative defenses, also called "exceptions,"
apply.  Fourth, if respondent successfully demonstrates an affirmative defense, the Court may
nevertheless order return of the child if doing so would further the Convention's goals.  Fifth, the
Court must consider any ancillary issues, such as requests for fees and costs.  The Court
addresses each of these steps in turn.

### A.  The Case Is Within the Scope of the Hague Convention, and Abstention Is Not Appropriate

The Convention applies if (1) the children were "habitually resident in a Contracting
State immediately before any breach of custody or access rights" and (2) the children are under
the age of sixteen.  Convention Art. 4.  Even if the Convention applies, the Court may be
required to abstain from hearing the case due to parallel custody proceedings in other courts, in
the United States or other countries.  "In a situation where there is a state court custody
proceeding and a petition is filed in federal court under the Hague Convention, but the Hague
Convention has not been raised, or raised but not litigated, in the state court, . . . abstention is not
appropriate."  Yang v. Tsui, 416 F.3d 199, 202 (3d Cir. 2005) ("Yang I") (applying Younger v.
Harris, 401 U.S. 37 (1971)); see also Convention Art. 16.  Instead, the state court should stay its
proceedings until the federal court has "determined that the child is not to be returned."
Convention Art. 16.

### 1.  The Hague Convention Applies

Both criteria for application of the Hague Convention are met in this case.  The first
requirement is that the children in question were "habitually resident in a Contracting State
immediately before any breach of custody or access rights."  Convention Art. 4.  As discussed
infra, all three children were habitual residents of Mexico before the alleged breach of custody
rights.  Mexico is a party to the Hague Convention.  See Hague Conference of Private

International Law, Convention Status Table, available at

http://www.hcch.net/index_en.php?act=conventions. status&cid=24 (last visited Feb. 23, 2012).

The second requirement is satisfied because all three children are under the age of sixteen: as of

the date of this Memorandum, Paquito is twelve, Katie is eight, and Chelsey is two.  (Hague

Application Regarding Francisco Javier Montes Jr. 1; Hague Application Regarding Kate Alexis

Montes 1; Hague Application Regarding Chelsey Megan Montes, Pet'r's Ex. 4, at 1.)

 The Court thus concludes that the Hague Convention applies to the Petition.

### 2. The Case Poses No Abstention Problems

 There is only one other judicial proceeding pending regarding the custody of the three

children, and it does not bar this Court's consideration of the Petition.  Neither party has filed a

divorce or custody petition in Mexico.  (1/18/12 Tr. 50–51.)  On December 8, 2011—after this

case was filed—respondent filed a Complaint in Divorce in the Court of Common Pleas in

Chester County, Pennsylvania, in which she seeks custody of the children.  (Compl. Divorce 2,

7–8).  However, there is no evidence that the Hague Convention has been "raised and litigated"

in the Court of Common Pleas.  Yang I, 416 F.3d at 202.  To the contrary, respondent's divorce

petition acknowledges: "[T]here is an action [in] Federal court for the return of the children to

Mexico under the Hague Convention."  (Compl. Divorce 7.)

 The Court thus concludes that the pending Chester County Court of Common Pleas case

does not require the Court to abstain from adjudicating the Petition.  The Court will proceed to

analyze the merits of the parties' claims.

### B.  Petitioner Has Established a Prima Facie Case for Return of Children

 A petitioner has the initial burden of proving by a preponderance of the evidence that

"the child was habitually resident in a State signatory to the Convention and was wrongfully

removed to a different State" or wrongfully retained in a different State.  Karpenko v. Leendertz,

619 F.3d 259, 263 (3d Cir. 2010); see also 42 U.S.C. § 11603(e)(1)(A).  This is a wrongful-

retention case.[12]  Retention is wrongful when two elements are present: (1) the retention "is in

breach of rights of custody attributed to a person, an institution or any other body, either jointly

or alone, under the law of the State in which the child was habitually resident immediately

before the . . . retention"; and (2) "at the time of . . . retention those rights were actually

exercised, either jointly or alone, or would have been so exercised but for the . . . retention."[13]

Convention Art. 3.

       Courts in the Third Circuit apply a four-part inquiry to determine if a petitioner has

established a prima facie case.  Karpenko, 619 F.3d at 253.  The Court "must determine (1) when

the . . . retention took place; (2) the child's habitual residence immediately prior to such . . .

retention; (3) whether the . . . retention breached the petitioner's custody rights under the law of

the child's habitual residence; and (4) whether the petitioner was exercising his or her custody

rights at the time of . . . retention."  Id.

---

[12] Although the legal standard is the same for "wrongful removal" and "wrongful retention" cases and the legal authority cited in this Memorandum refers to both types, the two labels refer to slightly different factual situations.  "'Wrongful removal' refers to the taking of a child from the person who was actually exercising custody of the child. 'Wrongful retention' refers to the act of keeping the child without consent of the person who was actually exercising custody." Feder v. Evans-Feder, 63 F.3d 217, 220 n.4 (3d Cir. 1995) (quoting the Hague International Child Abduction Convention; Text and Legal Analysis ("Hague Convention Analysis"), Pub. Notice 957, 51 Fed. Reg. 10494 (1986)).  Petitioner alleges that respondent was supposed to return with the children to Mexico at the conclusion of their vacation.  (12/22/11 Tr. 16.) Because petitioner's theory is that he gave respondent, his wife, permission to travel but that respondent kept the children in the United States against his permission, this is a "wrongful retention" case.  See Feder, 63 F.3d at 220 n.4.

[13] Under respondent's theory of events, the retention was not wrongful because petitioner consented to the move during the "family vote" that took place in late June or early July 2010. The Court rejects this argument; the Court finds that petitioner did not consent to a permanent move to the United States and understood the vote to refer only to a vacation.

1. **First Prong of Prima Facie Case: The Retention Took Place No Later Than July 25, 2010**

Determining the date of retention as a threshold matter is important for two reasons. First, it provides the foundation for the other parts of the prima facie case because the Court eventually must determine where the child was "habitually resident immediately before the removal or retention." Convention Art. 3. Second, the date of retention affects the application of the affirmative defense in Article 12 of the Convention.

"The wrongful retention does not begin until the noncustodial parent . . . clearly communicates her desire to regain custody and asserts her parental right to have [her child] live with her." Karkkainen, 445 F.3d at 290 (citing Slagenweit v. Slagenweit, 841 F. Supp. 264, 270 (N.D. Iowa 1993)); see also Nat'l Ctr. Missing & Exploited Children, Litigating International Child Abduction Cases Under the Hague Convention 31 (2007), http://www.missingkids.com/en_US/training_manual/NCMEC_Training_Manual.pdf ("NCMEC Manual") (providing same standard and citing, inter alia, Slagenweit).

The Court concludes that the wrongful retention in this case began on the date in July 2010—which the Court will treat as July 25[14]—when respondent called petitioner from Houston, Texas, and told him that she intended to remain in the United States with the children permanently. After the telephone call, petitioner understood that respondent did not intend to bring the children back to Mexico, he informed her that he wanted her to return, and he contacted the Mexican Secretariat to learn what legal remedies were available to him. (12/22/11 Tr. 21, 27–28.)

---

[14] The exact date of the call is not in the record; petitioner testified that this telephone call occurred the week after after the July 12, 2010, departure, and that, after the call, he sent Richard Buyauskas an e-mail on July 25, 2010 (12/22/11 Tr. 21); accordingly, the Court assumes that the wrongful retention occurred no later than July 25, 2010.

-21-

The Court therefore concludes that respondent's wrongful retention of Paquito, Katie, and Chelsey began on a date no later than July 25, 2010.

### 2.    Second Prong of Prima Facie Case: The Children's Habitual Residence Immediately Prior to Wrongful Retention Was Mexico

The Court must next determine in which country "the child was habitually resident immediately before the removal or retention."  Convention Art. 3a.  The Convention does not define habitual residence.  The Third Circuit has defined the term as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective."  Yang v. Tsui, 499 F.3d 259, 271 (3d Cir. 2007) ("Yang II").  "The inquiry focuses on the child, but also must consider the parents' present, shared intentions regarding their child's presence [in a particular location]."  Id. at 271–72 (internal citations and quotation marks omitted).  Ultimately, the inquiry is "whether a child has made a country her home before the date of her removal or retention."  Id.; see also Whiting v. Krassner, 391 F.3d 540, 550 (3d Cir. 2004); Elisa Perez-Vera, Official Hague Convention Conference Reporter, Explanatory Report ¶ 11.

Prior to July 25, 2010, the children's habitual residence was Mexico.  Before the wrongful retention, the children habitually resided in Mexico with petitioner and respondent for the children's entire lives, interrupted only by vacations to the United States.  Petitioner did not consent to a permanent move to the United States; instead, he believed that respondent and the children were traveling to the United States for a vacation that was to end on September 3, 2010, with a return flight from Houston to Guadalajara.  "Where the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration . . . most courts will find no change in habitual residence," unless "the child's original habitual residence has been effectively abandoned by the shared intent of the parents."  Whiting, 391 F.3d 549.

There is no such shared intent in this case; petitioner never agreed for the children to reside in the United States, nor has he abandoned his desire for the children to return to Mexico.

The Court thus concludes that the children's habitual residence prior to July 25, 2010, was Mexico and that petitioner and respondent had no "present, shared intention" for the children to reside in the United States.  See Yang II, 499 F.3d at 271.

### 3.   Third Prong of Prima Facie Case: The Wrongful Retention Breached Petitioner's Custody Rights Under Mexican Law

In the third step of the prima facie case, the Court applies the law of the country of habitual residence to determine whether the retention breached petitioner's custody rights.

### i.   Legal Standard Under the Hague Convention

The Court must "carefully examine the country of origin's custody laws to determine whether the party seeking the child's return had custody rights in that country . . . at the time the child was [retained or removed]."  Yang II, 499 F.3d at 275 (internal citation and quotation marks removed).  "Rights of custody" includes "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Convention Art. 5a.  When the country of origin has multiple territorial units, the Court applies the custody rights laws of the territorial unit in which the child was habitually resident.  See Convention Art. 31. The Court "may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable."  Id. Art. 14.  However, it is fundamental that the Court is not "actually decid[ing] the custody question" or "resolv[ing] any subsequent custody adjudication"; instead, the Court is determining the "factual status quo ante."  In re Adan, 437 F.3d 381, 391–92 (3d Cir. 2006).

The Court must therefore look to the child custody laws of the state of Jalisco, Mexico, where the family resided prior to July 2010, to determine whether respondent breached petitioner's custody rights.  An English translation of applicable portions of the Código Civil del Estado de Jalisco ("CCEJ") was introduced at the December 22, 2011, hearing as Petitioner's Exhibit 5, and the parties stipulated to the authenticity of the translation.[15]  In addition, a handful of other district courts in the United States have addressed the CCEJ and its provisions in other Hague Convention cases, and the Court discusses those cases below.

### ii.  Custody Law in the State of Jalisco, Mexico

Custody law in Mexico is based on the concept of "patria potestas" (also spelled "patria potestad"), which is:

> "The parents' responsibility to care for the child, reside with the child, and provide for the child's necessities, including food, education and development." The patria potestas gives a right to correct the child, the right to control and manage any property or rights the child may have and the right to the child's assistance. By law, the <u>right to patria potestas belongs to both parents</u>, but the exercise of the right, by necessity, normally involves one decision-maker. Concurrence or agreement is not required. Historically, the father had superior rights of the patria potestas, but today it is a joint responsibility. If the parents are deceased or unavailable, the paternal grandparents may exercise the patria potestas. If the paternal grandparents are unavailable, the maternal grandparents may exercise the patria potestas.

---

[15] At the hearing, petitioner's counsel stated she did not know who translated the CCEJ but that the translation introduced into evidence was provided by the United States Department of State. (12/22/11 Tr. 108–10.)  She also stated that "[t]here was . . . an issue with translation between [the United States and Mexico] and it took some time to . . . get it."  (<u>Id.</u>)  Some portions of the translation are difficult to understand.  (<u>See, e.g.</u>, CCEJ Article 556 ("Custody is always in the direct benefit of its recipient, with full recognition of his or her personal rights.").)  Because the interpretation of the CCEJ is not the primary issue in this case and because other United States courts have expounded on the CCEJ's child custody provisions, the suboptimal translation is no bar to the Court's reaching a decision in this case.

March v. Levine, 136 F. Supp. 2d 831, 842 (M.D. Tenn. 2000) (emphasis added) (quoting Antoinette Sedillo Lopez, International Law—U.S./Mexico Cross-Border Child Abduction—The Need for Cooperation, 29 N.M. L. Rev. 289, 297 (1999)).

In Jalisco, Mexico, patria potestas "governs the relationship between parents and their children" as part of the CCEJ.  See Seaman v. Peterson, 762 F. Supp. 2d 1363, 1378–79 (M.D. Ga. 2011) (citing Whallon v. Lynn, 230 F.3d 450 (1st Cir. 2000)).  "Patria potestas 'is exerted by both parents,' ([CCEJ Art.] 581), and lasts until it ceases under Article 597, is terminated under Article 598, or is suspended under Article 601."  Id.; see also Altamiranda Vale v. Avila, 538 F.3d 581, 586–87 (7th Cir. 2008) (applying Mexican law and discussing patria potestas).

### iii.      Application of Jalisco, Mexico, Custody Law

The Court concludes that petitioner had custody rights under CCEJ Article 581 and that those rights had not been abrogated by any other CCEJ provision.  The parties do not dispute that petitioner is the biological father of all three children.  Therefore, under Article 581, which provides that "[p]aternal authority/responsibility (patria potestas) is exerted by both parents or in the given case, by the surviving parent," petitioner had custody rights over all three children unless one of the three exceptions—cessation under Article 597, termination under Article 598, or suspension under Article 601—applies.  See Seaman, 762 F. Supp. 2d at 1378–79.

No such exception is applicable here.  Article 597 provides that patria potestas ceases in the event of the parent's death, "emancipation of the minor," the minor's reaching the age of majority, or the revocation of an adoption.  None of these have occurred.  Article 598 states that patria potestas "can" be terminated in certain circumstances, but only by a judicial decree at the conclusion of a criminal, civil, or divorce case.  See CCEJ Article 599.  Likewise, Article 601 requires "a judicially pronounced lack of capacity," "a judicially pronounced absence," or "a

guilty verdict that imposes the suspension [of patria potestas] as part of the sentence."  In this case, neither party has introduced any evidence that, at any time, there have been any Mexican court orders bearing on the custody of the children or on petitioner's fitness as a parent. Therefore, petitioner had custody rights as to his three children under the law of Jalisco, Mexico, before respondent retained the children in the United States.

The Court further concludes that respondent breached petitioner's custody rights under the law of Jalisco when she retained the children in the United States.  "Under the doctrine of patria potestas, both parents must consent to the removal of the child from the country."  Basil v. Sosa, No. 07-cv-918-T-27TGW, 2007 WL 2264599, at *8 (M.D. Fla. Aug. 6, 2007) (adopting report and recommendation of magistrate judge) (applying Jalisco law and citing Third Civil Collegiate Court of the First Circuit of Mexico, Weekly Federal Court Report); see also Seaman, 762 F. Supp. 2d at 1379 ("[W]hen the Respondent removed the children without the Petitioner's consent, he violated the Petitioner's rights of custody.").

Because he has established that respondent breached his custody rights under the law of the children's habitual residence—that is, Jalisco, Mexico—the third prong of the prima facie case is satisfied.

### 4.  Fourth Prong of Prima Facie Case: Petitioner Was Exercising Custody Rights at the Time of Retention

The fourth element of a prima facie case under the Hague Convention is "whether the petitioner was exercising his or her custody rights at the time of removal or retention." Karpenko, 619 F.3d at 253.  "The petitioner can show the exercise of custody rights by demonstrating that he or she kept or sought to keep[] some sort of regular contact with the child. Essentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights."  Yang II, 499 F.3d at 277.  The test for

-26-

abandonment is "stringent." Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005).  "Once it is

determined that a party had valid custody rights under the country of origin's laws . . . [t]he

applicant need only provide some preliminary evidence that he or she actually exercised custody

of the child, for instance, took physical care of the child.'"  In re Adan, 437 F.3d at 391 (citing

Hague Convention Analysis, 51 Fed. Reg. at 10,507).This element is satisfied.  Petitioner lived

with the children and cared for them until they left Mexico with respondent in July 2010.

Although the Court did not credit petitioner's testimony that he was the de facto sole caretaker of

the children, the Court found that petitioner shared the responsibilities of childcare with

respondent while they lived together in Mexico.  (12/22/11 Tr. 14.)  While respondent and the

children were in Texas, petitioner spoke to respondent by telephone; when he learned that she

had resolved not to return to Mexico, petitioner tried to encourage respondent to return, and he

immediately looked into legal steps to reassert his parental rights.  (12/22/11 Tr. 21, 27–28.)

This satisfies petitioner's burden to show "some preliminary evidence that he . . . actually

exercised custody" at the time of retention.  In re Adan, 437 F.3d at 391.

     Respondent's two arguments to the contrary are unavailing.  Petitioner did not "fail[] to

exercise his . . . custodial rights" through "clear and unequivocal abandonment."  Yang II, 499

F.3d at 277.  Respondent argued in her Pretrial Memorandum that "she and the children actually

had a conversation and a vote and the father acquiesced."  (Resp't's Pretrial Mem. 3.)  However,

as discussed supra, the Court rejected this theory of the vote's significance.  Respondent's other

theory for abandonment, that petitioner "could have" been in touch with the children but "chose"

between the February 2011 argument and November 2011 (1/18/12 Tr. 29), is also unpersuasive.

First, this stage of the case focuses on "the time of removal or retention," Karpenko, 619 F.3d at

253, not petitioner's later actions.  Moreover, petitioner offered at least two persuasive reasons

for ceasing contact with his children: the Mexican authorities advised him to let the legal process take its course, and he suffered mental health problems because he missed the children.

Because petitioner has met the lenient standard of showing that he was actually exercising custody rights at the time of the retention, he has satisfied the fourth element of a prima facie case.

### 5. Conclusion

The Court concludes that petitioner has established all four elements of a prima facie case for return of a child under the Hague Convention.  Thus, in this case, a wrongful retention as defined by the Hague Convention occurred because the retention was "in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the . . . retention," and "at the time of . . . retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the . . . retention."  Convention Art. 3.

### C.  Respondent Has Established Affirmative Defenses to Return of Children

"After a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country of habitual residence."  Karkkainen, 445 F.3d at 288 (citing Baxter, 423 F.3d at 368); see also Abbott v. Abbott, __ U.S. __, 130 S. Ct. 1983, 1997 (2010) ("[A] return order is not automatic. Return is not required if the abducting parent can establish that a Convention exception applies.").  The affirmative defenses, also called "exceptions," are to be construed narrowly. Baxter, 423 F.3d at 371; see also 42 U.S.C. § 11601(a)(4).   Even if respondent establishes an affirmative defense, however, the Court is not obligated to deny the petition; it may still conclude that return is appropriate.  See Convention Art. 18.

The affirmative defenses a respondent may prove are:

1. Under Article 12: By a preponderance of the evidence, that the child is now settled in his or her new environment;
2. Under Article 13: By a preponderance of the evidence, that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of his or her views;
3. Under Article 13a: By a preponderance of the evidence, that the person from whom the child was removed was not exercising custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention;
4. Under Article 13b: By clear and convincing evidence, that there is a grave risk that the child's return would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation; or
5. Under Article 20: By clear and convincing evidence, that the child's return would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.

See Karpenko, 619 F.3d at 263 n.3; see also 42 U.S.C. § 11603(e)(2).

The Article 12 "well settled" and the Article 13 "mature child objecting" affirmative defenses apply in this case.  The Court discusses each in turn.[16]

### 1. The Article 12 Well-Settled Affirmative Defense Is Established

Article 12 of the Convention states, in relevant part:

Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the

---

[16] In her Proposed Findings of Fact and Proposed Conclusions of Law, respondent asserts that the Article 13a "consent/acquiescence" and Article 13b "grave risk" defenses also apply in this case.  Because the Court concludes that two other affirmative defenses apply, the Court does not address the separate inquiries required in determining whether Articles 13a and 13b would apply in this case.

> period of one year referred to in the preceding paragraph, shall also
> order the return of the child, unless it is demonstrated that the child
> is now settled in its new environment.

Respondent must prove this defense by a preponderance of the evidence.  42 U.S.C.

§ 11603(e)(2)(B).

Before determining whether the children are "settled in [their] new environment," the

Court must determine whether a year elapsed between the "date of the wrongful retention" and

the "date of the commencement of the proceedings."  Art. 12.

### i.   The Well-Settled Affirmative Defense Is Available to Respondent

To determine whether this affirmative defense is available, the Court must determine

whether a year elapsed between the "date of the wrongful removal or retention" and the "date of

the commencement of the proceedings."  The former is determined under the first prong the

prima facie case, as discussed supra.  The "date of the commencement of the proceedings" is the

date the petition is filed, thus "commencing a civil action . . . in any court which has jurisdiction

of such action."  42 U.S.C. §§ 11603(b), (f)(3).  The "commencement of the proceedings" does

not include "[m]erely contacting a country's Central Authority or law enforcement with a

complaint."  NCMEC Manual 34.

Even if a year elapses between the wrongful retention and the commencement of a court

proceeding, however, some courts have applied the doctrine of equitable tolling and held that the

well-settled defense is not available "if the abducting parent conceals the child from the left-

behind parent."  NCMEC Manual 34 (citing, inter alia, Friedrich v. Friedrich, 78 F.3d 1060,

1068 (6th Cir. 1996)); see also Hague Convention Analysis, 51 Fed. Reg. at 10,494 (noting that

it is "highly questionable" whether "an alleged wrongdoer [who] concealed the child's

whereabouts from the custodian necessitating a long search for the child and thereby delayed the

commencement of a return proceeding . . . should . . . benefit from such conduct absent strong countervailing considerations").  Two district courts in this circuit have addressed equitable tolling of the one-year limit.  Both refused to toll the one-year limit.  See Lutman v. Lutman, No. 1:10-CV-1504, 2010 WL 3398985, at *5 n.8 (M.D. Pa. Aug. 26, 2010) (refusing to toll limit given petitioner's "awareness that [respondent] was resistant to returning [the child to petitioner]"); Castillo v. Castillo, 597 F. Supp. 2d 432, 439 n.11 (D. Del. 2009) (holding that tolling was not appropriate because the respondent had "not concealed child's location from petitioner").

The Court has already determined that the "date of the wrongful retention" is no later than July 25, 2010.  Petitioner filed the Petition on October 13, 2011—more than one year later. Therefore, the Article 12 well-settled defense is available unless petitioner's delay in filing the Petition is excusable based on respondent's concealment of the children.  The Court concludes that it is not.  Respondent and the children have resided in Pennsylvania since late August 2010, and petitioner knew where they were; he even communicated with them while they were at respondent's mother's house.  (1/18/12 Tr. 6; 12/22/11 Tr. 54.)  Although petitioner was diligent in contacting the Mexican authorities for assistance, the delay of more than fourteen months before petitioner filed this case was not attributable to concealment of the children by respondent.  The Court is sympathetic to petitioner in that it took him time to gather the documents to complete the Hague Applications and the CI and Secretariat took many months to process the applications.  (12/22/11 Tr. 27–28; 12/14/11 Letter from Beth Cooper.)  However, precedent does not authorize tolling based on bureaucratic foot-dragging; instead, tolling is appropriate "where the parent removing the child has secreted the child from the parent seeking

return," obstructing the noncustodial parent seeking return from filing suit in the appropriate jurisdiction.  Furnes v. Reeves, 362 F.3d 702, 723–24 (11th Cir. 2004).

Because respondent did not conceal the children's location from petitioner, the Court concludes that equitable tolling is not appropriate.  Thus, the Article 12 well-settled defense is available to respondent.

### ii.  The Well-Settled Affirmative Defense Applies

There are no Third Circuit cases discussing Article 12's requirement that the children be "now settled in their new environment."  According to the State Department,

> [N]othing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent[']s burden of proof. Moreover, any claims made by the person resisting the child's return will be considered in light of evidence presented by the applicant concerning the child's contacts with and ties to his or her State of habitual residence. The reason for the passage of time, which may have made it possible for the child to form ties to the new country, is also relevant to the ultimate disposition of the return petition.

Hague Convention Analysis, 51 Fed. Reg. at 10,509.

In concluding that the well-settled exception applied, one district court in this circuit considered the following factors:

> (1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the [parent's] employment or other means of support; (6) whether the child has friends and relatives in the area; . . . (7) to what extent the child has maintained ties to the country of habitual residence . . . [8] the level of parental involvement in the child's life[;] [9] active measures to conceal [the] child's whereabouts (and the possibility of criminal prosecution related thereto)[;] and [10] the immigration status of the child and respondent.

Castillo, 597 F. Supp. 2d at 438 (citing, inter alia, Lops v. Lops, 140 F.3d 927, 946 (11th Cir. 1998); In re Koc, 181 F. Supp. 2d 136, 153 (E.D.N.Y. 2001)).

The evidence overwhelmingly shows that all three children are well settled in the United States.  The evidence introduced at the hearing and the Court's in camera interviews with the children demonstrated that Paquito and Katie are intelligent children of remarkable maturity.  They speak English fluently and eloquently despite having lived in the United States for less than seventeen months.  In addition to respondent's testimony that all three children are "doing great," the Court found credible respondent's mother's testimony that the children's adjustment to the United States was "impressive" and respondent's brother's testimony that the children are doing "extremely well."  (1/18/12 Tr. 22, 64, 69–70.)  As set forth below, the Castillo factors also uniformly support the Court's conclusion.

Age: Paquito is twelve and Katie is eight.  (Hague Applications 1.)  They are old enough to have formed meaningful connections to the United States, including friendships with other children and with respondent's family, and they did so.  (1/18/12 Tr. 22.)  Although Chelsey is much younger, which ordinarily would weigh against a finding that she is well settled, in the context of all the other factors discussed below, Chelsey's age is not determinative.

Stability of New Residence: The three children resided for approximately sixteen months at their grandmother's home in West Chester, Pennsylvania, and recently moved to a nearby townhome that respondent has rented, also in West Chester.  (Id. at 5–6.)  The new residence is a four-bedroom, one-and-a-half-bathroom townhome, and each child has his or her own bedroom.  (Id.)  The prospects for this residence remaining stable are promising because the rent is government-subsidized and is far less than the amount respondent receives each month in governmental assistance.  (Id. at 52.)

Attendance at School or Daycare:  Paquito and Katie have attended school in the United States since their arrival in August 2010.  Both excel: they are each on the honor roll, (id. at 22);

each speaks fluent English despite not knowing the language when they moved here, (id. at 80–81); Paquito, a sixth grader, is in the gifted program and plays Little League baseball, (id.); and Katie "love[s]" the third grade and also receives high marks (1/18/12 Chambers Tr. 7.). Chelsey is too young for school, but respondent's family assists in her care.  (1/18/12 Tr. 64, 69–70.)

Attendance at Church: The children attend church with respondent's family.  (Id. at 64.)

Stability of Employment or Means of Support: Although respondent presently receives monthly financial assistance from the government, she recently obtained her nail technician license and hopes to begin working regularly once this case ends.  (Id. at 52.)  Respondent's family also assists her financially.  (Id. at 60.)

Presence of Friends or Relatives in the Area:  Paquito and Katie have many friends in the United States.  (Id. at 22.)  Respondent's mother, stepfather, and brother—who is also Paquito's godfather—all live in the greater Philadelphia area, and the family members see each other several times a week.  (Id. at 21–22, 69–70.)

Extent of Ties to Mexico:  Paquito and Katie identify more closely with the United States than Mexico.  Both prefer living in the United States to living in Mexico and do not wish to return.[17]  (1/18/12 Chambers Tr. 2–3, 5–6.)  Katie stated that her preference for the United States is due in part to her belief that the family has a higher quality of life here.  (See id. at 6 (Katie's testimony that the family "never had . . . too much stuff in Mexico . . . like . . . food and more things so [they] can live").)  There was no evidence that the children miss living in Mexico or any aspect of living there.

Level of Parental Involvement in the Children's Life: Respondent enjoys a very close relationship with her children, for whom she is the primary caretaker.  (1/18/12 Tr. 69.)  The

---

[17] The Court also discusses the "mature child objecting" affirmative defense infra.

success with which the children adapted to the United States reflects well on respondent's ability to parent her children, including getting medical care for Paquito's latent tuberculosis and getting her children vaccinated once they arrived in this country.  (Id. at 58–69.)

Active Measures to Conceal Children's Whereabouts and Possibility of Criminal Prosecution:  As discussed supra, respondent did not take any measures to conceal the children's whereabouts from petitioner.  Petitioner knew the itinerary for the July 2010 trip to the United States, and he was aware that respondent and the children were living at respondent's mother's home in West Chester, Pennsylvania.  Moreover, respondent herself never took steps to cut off petitioner's contact with the children.  The gap in communication arose from an argument between petitioner and respondent's mother, (id. at 6–13, 65–67, 70–71), and petitioner introduced no evidence that he was unaware of the children's location during that gap.

Immigration Status of Children and Respondent:  Respondent and all three children are United States citizens who have United States passports.  (E.g., 12/22/11 Tr. 12)

Other Relevant Factors:  The children have received medical care in the United States superior to the medical care they received in Mexico.  Unlike in Mexico, they have regular doctors in the United States.  (See 1/18/12 Tr. 38, 45–46.)

Respondent exceeded her burden of proving by the preponderance of the evidence that the Article 12 well-settled affirmative defense applies.  She has shown convincingly that the children are "now settled in [their] new environment."  Convention Art. 12; see also 42 U.S.C. § 11603(e)(2); Karpenko, 619 F.3d at 263 n.3.

## 2.  The Article 13 Mature-Child-Objecting Affirmative Defense is Established

The Court also concludes that respondent has proven by a preponderance of the evidence that return is not appropriate because Katie and Paquito "object[] to being returned and ha[ve]

attained an age and degree of maturity at which it is appropriate to take account of [their]

views."  Convention Art. 13; see also 42 U.S.C. § 11603(e)(2)(B).

The Third Circuit explained the proper analysis for the Article 13 defense in Yang II:

> [T]he "wishes of the child" exception requires consideration of the
> goals of the Convention and a determination of whether the child
> is of sufficient age and maturity for his or her views to be taken
> into account.  [De Silva v. Pitts, 481 F.3d 1279, 1286 (10th Cir.
> 2007).]  The Convention does not set an age at which a child
> is automatically considered to be sufficiently mature[;] rather the
> determination is to be made on a case-by-case basis. "Given the
> fact-intensive and idiosyncratic nature of the inquiry, decisions
> applying the age and maturity exception are understandably
> disparate." Id. at 1287 (internal citation omitted).  In making its
> determination, a court should also consider whether a child's
> desire to remain or return to a place is "the product of undue
> influence," in which case the "child's wishes" should not be
> considered.  Id. at 1286; see also Hague Convention Analysis, 51
> Fed. Reg. at 10,509 ("A child's objection to being returned may be
> accorded little if any weight if the court believes that the child's
> preference is the product of the abductor parent's undue influence
> over the child.").

Yang II, 499 F.3d at 278-79.

The Court concludes that both Paquito and Katie object to being returned to Mexico and

are old enough and mature enough for their views to be given credence.  The Court further

concludes that neither child's desire to remain in the United States is "the product of undue

influence."  See id.

The Court takes Paquito's and Katie's views into account because both children are

articulate, intelligent, and mature.  Both demonstrated extraordinary composure and behavior

throughout these adversarial legal proceedings.  In circumstances that would be expected to

unnerve most children their age—including, in Paquito's case, testifying in federal district court

and being subject to cross-examination—Paquito and Katie remained unflappable.  During

Paquito's open-court testimony and the children's in camera interviews, both made extremely

-36-

favorable impressions.  The evidence introduced at the hearings—including that Paquito and

Katie have learned fluent English in less than two years, that both are on the honor roll, and that

they have impressed respondent's family with their adaptation to the United States—further

supports the Court's conclusion that they are "of sufficient age and maturity" for their views to

receive consideration.  See Art. 13.

Paquito objected to being returned to Mexico in open court, (1/18/12 Tr. 84), and both

children objected during their in camera interviews with the Court, away from respondent and

her family (1/18/12 Chambers Tr. 2–3, 5–6).  Paquito and Katie gave articulate, rational

explanations as to why they want to stay in the United States; Katie cited the higher quality of

life, including the family's greater ability to afford food, (id. at 6), and Paquito expressed

concern about his father's "violent" nature and use of a belt to discipline him (id.).  Given their

coherent explanations, their mature comportment, their clear and forthright statements that they

wish to remain in the United States, and the fact that their desire to stay persisted even when the

Court questioned them further about whether anyone told them how to answer the Court's

questions, the Court concludes that the children's preferences were not the product of undue

influence.

Accordingly, the Court also concludes that the mature-child-objecting defense justifies

permitting the children to remain in the United States.[18]

---

[18] Because the well-settled defense also applies, the Court does not reach the issue of whether it
would have to order the return of Chelsey if its conclusion relied solely on the mature-child-
objecting defense.  Chelsey, aged two and a half, is not sufficiently mature to express a view on
whether she should be returned to Mexico.  Having found that Paquito and Katie object to being
returned, however, the Court concludes that separating the children would not be a just result and
would not further the aims of the Hague Convention.  See Preamble to Hague Convention
(expressing policy, inter alia, that "the interests of children are of paramount importance in
matters relating to their custody"); cf. In re H.V., __ A.3d __, 2012 PA Super 19, 2012 WL
258673, at *6 (Pa. Super. Ct. Jan. 30, 2012) ("'Absent compelling reasons to separate siblings,
they should be reared in the same household to permit the continuity and stability necessary for a
young child's development.'" (quoting Johns v. Cioci, 865 A.2d 931, 942 (Pa. Super. 2004)).

**D.  A Discretionary Order of Return of Children Is Not Appropriate**

Even though respondent has established two affirmative defenses to return, "the court

retains the discretion 'to order the return of the child if it would further the aims of the

Convention[,] which is to provide for the return of a wrongfully removed child.'" Yang II, 499

F.3d at 278 (quoting de Silva, 481 F.3d at 1285); see also Convention Art. 18 ("The provisions

of this Chapter do not limit the power of a judicial or administrative authority to order the return

of the child at any time.").

A discretionary order of return is not appropriate in this case.  While one aim of the

Hague Convention is "provid[ing] for the return of a wrongfully removed child," Yang II, 499

F.3d at 278, the Convention's Preamble emphasizes both that "the interests of children are of

paramount importance in matters relating to their custody" and that one of the Convention's

objectives is "to protect children internationally from the harmful effects of their wrongful

removal or retention" (emphasis added).  It is in keeping with those two goals that the

Convention's drafters provided for narrow exceptions to return, to be used only in appropriate

cases where the children have become well settled or are mature and do not wish to be returned.

The Court concludes that this such a case.  Paquito, Katie, and Chelsey have flourished in a

healthy environment in the United States over approximately a year and a half since the

wrongful retention at issue.  A discretionary return pursuant to Article 18 is, therefore, not

justified.

**E.  Petitioner Is Not Entitled to Fees and Costs**

Petitioner seeks to recover "all legal costs and fees" that he has "incurred as a result of

the wrongful removal and retention of the children by respondent."  (Pet. 6.)  However, under

ICARA, an award of fees and costs is only appropriate when the Court orders the return of a

-38-

child.  See 42 U.S.C. § 11607(b)(3) ("Any court ordering the return of a child pursuant to . . .

[the Convention] shall order the respondent to pay necessary expenses incurred by or on behalf

of the petitioner . . . unless the respondent establishes that such order would be clearly

inappropriate."); see also Hirts v. Hirts, 152 F. App'x 137, 139 (3d Cir. 2005) (affirming fee

award in Hague Convention case in which district court ordered child's return).  Because it has

not ordered the children returned to Mexico, the Court denies petitioner's request for fees and

costs.[19]

## V.  CONCLUSION

In deciding an issue presented by a Hague Convention case, the Supreme Court recently

observed:

> Custody decisions are often difficult. Judges must strive always to
> avoid a common tendency to prefer their own society and culture,
> a tendency that ought not interfere with objective consideration of
> all the factors that should be weighed in determining the best
> interests of the child. This judicial neutrality is presumed from the
> mandate of the Convention, which affirms that the contracting
> states are "[f]irmly convinced that the interests of children are of
> paramount importance in matters relating to their custody."

Abbott, 130 S. Ct. at 1996 (quoting Convention Preamble).

The litigants in this case are parents who suffered a grievous breakdown in their marriage

and hotly contested a number of issues, both factual and legal, before this Court.  At its core,

however, this is a case about three children, Paquito, Katie, and Chelsey, and the Court's

resolution of the case must reflect the "paramount importance" of those children's interests.  It is

for that reason that the Hague Convention has made the well-settled and mature-child-objecting

---

[19] Other sources may be available to assist petitioner in the repayment of fees and costs.  See 42 U.S.C. § 11607(b)(2) ("[L]egal fees or court costs incurred in connection with an action brought under [the Convention] shall be borne by the petitioner unless they are covered by payments from Federal, State, or local legal assistance or other programs.").

affirmative defenses available even when a petitioner has made out a prima facie case for return.

The Court therefore denies the Petition for Return of Children to Petitioner.

An appropriate Order follows.